**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

2006 OCT 10  PM 4: 29

CLERK ~~~~~~
SO. DIST. OF GA.

| | |
|---|---|
| DOUGLAS ASPHALT COMPANY, | ) |
| JOEL H. SPIVEY and KYLE SPIVEY, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) |
| | ) |
| QORE, INC.; ANALYTICAL TESTING | ) |
| SERVICES, INC.; GEORGENE M. | ) |
| GEARY; GLENN DURRENCE; | ) |
| GUOHUA "GEORGE" LIAN; PAUL V. | ) |
| MULLINS; GREG MAYO; LARRY | ) |
| MATTHEWS; HAROLD LINNENKOHL; | ) |
| and RICK DOUDS | ) |
| | ) |
| **Defendants.** | ) |

CV206-229

Civil Action No.: _____

## COMPLAINT FOR DAMAGES

**COMES NOW** Douglas Asphalt Company, Joel H. Spivey and Kyle Spivey, Plaintiffs in the above-styled action, and file this their Complaint for Damages against Defendants, showing this Court the following:

### I.    PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Douglas Asphalt Company ("DAC") is a Georgia corporation having its principal place of business in Douglas, Coffee County, Georgia.

2.    Defendant Qore, Inc. ("Qore") is a Georgia corporation that may be served through its registered agent, Ed Heustess, Jr., located at 4201 Pleasant Hill Road, N.W., Suite A,

*Page -1-*

Duluth, Georgia 30096.

3.      Defendant Analytical Testing Services, Inc. ("ATS") is a foreign corporation that is not registered to conduct business in the state of Georgia. Upon information and belief, ATS is principally located at 191 Howard Street, Franklin, Pennsylvania 16323.

4.      Defendant Paul V. Mullins ("Mullins") (now retired) was the Chief Engineer of the Georgia Department of Transportation ("GDOT") and may be served with process at 209 Secret Valley Drive, Ballground, Georgia.

5.      Defendant Glenn Durrence ("Durrence") was the Director of Construction for GDOT and is currently District Engineer for District 5 in Jesup, Wayne County, Georgia. He may be served with process at GDOT's Jesup office at 204 N. Highway 301, Jesup, Wayne County, Georgia.

6.      Defendant Georgene M. Geary ("Geary") is the State Materials and Research Administrator for GDOT and may be served with process at GDOT's office at 15 Kennedy Drive, Forest Park, Clayton County, Georgia.

7.      Defendant Greg Mayo ("Mayo") was the Contract Administrator for GDOT and is currently the State Construction Engineer. He may be served with process at GDOT's headquarters at No. 2 Capital Square, S.W., Atlanta, Fulton County, Georgia.

8.      Defendant Larry Matthews was the Construction Claims Administrator for GDOT and may be served with process at Matthews Construction Management, 2620 N. Berkley Rd. N.W., Apt. 714, Duluth, Georgia.

9.      Defendant Guohua "George" Lian ("Lian") is an employee of GDOT and may be served with process at GDOT's office at 15 Kennedy Drive, Forest Park, Clayton County,

*Page -2-*

Georgia.

10.     Defendant Harold Linnenkohl ("Linnenkohl") is the Commissioner of the Georgia Department of Transportation and may be served with process at GDOT's headquarters at No. 2 Capital Square, S.W., Atlanta, Fulton County, Georgia.

11.     Defendant Rick Douds ("Douds") is the testing management bureau chief for GDOT and may be served with process at GDOT's office at 15 Kennedy Drive, Forest Park, Clayton County, Georgia.

12.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of Georgia, Brunswick Division because this case involves claims that arise out of a highway project performed by Plaintiffs pursuant to a contract with the GDOT that was performed in McIntosh County, Georgia and Glynn County, Georgia, both in the Southern District of Georgia, Brunswick Division.

13.     Pursuant to 28 U.S.C. § 1331, jurisdiction is proper in the United States District Court as to all Defendants in that this action involves civil actions arising under the Constitution and laws of the United States.

14.     Jurisdiction is also proper in the United States District Court for the Southern District of Georgia, Brunswick Division as to all Defendants in this action as Defendants have committed tortious acts and/or caused harm as joint tortfeasors within the confines of McIntosh County, Georgia, and Glynn County, Georgia, which are the subject matter of this action and which have resulted in a single, indivisible harm to Plaintiff DAC.

## II.     FACTUAL ALLEGATIONS

15.     Plaintiff DAC is one of the largest asphalt producers in the State of Georgia and

employees approximately 500 people.

16.     DAC has successfully performed numerous projects for the Georgia Department

of Transportation ("GDOT") for more than thirty years.  DAC has won numerous quality awards

from GDOT and independent associations for its highway projects.

### The I-95 Project

17.     In 1996, GDOT awarded Contract No. NH-95-1(153) ("the I-95 project") to DAC

that involved, in part, the milling and resurfacing of various portions of Interstate 95.  The I-95

project was federally funded and approved by the United States Secretary of Transportation and

performed in McIntosh County, Georgia and Glynn County, Georgia.

18.     Included within the specifications for the I-95 project was the specified type of

asphalt mix to be used for the resurfacing, which GDOT approved using the "SuperPave"

guidelines, which were a part of the I-95 project.

19.     One ingredient of the SuperPave asphalt mixture is hydrated lime, which is a

relatively inexpensive component added to the asphalt mixture generally at a rate of 1% of the

weight of the dry aggregate and .5 % if Reclaimed Asphalt Pavement ("RAP") is added to the

mixture.

20.     Hydrated lime is used in asphalt mixtures because it may reduce the susceptibility

of the mixture  to moisture damage.

21.     GDOT developed the "job mix" formula, giving percentages of material used, and

also developed the procedures for testing a contractor's asphalt mix.

22.     DAC performed the I-95 project from 1996 through 1997.

23.     During production and placement, GDOT employees performed routine testing of

the asphalt mix utilized by DAC to determine its acceptability.

24.     During this time, GDOT employees gathered regularly and reviewed invoices received by DAC from its lime suppliers to verify that the proper amount of lime was being used in the asphalt mix.  GDOT employees also checked the lime-adding equipment at the plant to ensure a sufficient flow of lime.  On a daily basis, GDOT employees tested and entered notations into their asphalt plant diary that sufficient lime was being added to the asphalt produced for the I-95 project.

25.     During the construction of the I-95 project, the asphalt mix being used by DAC passed all acceptance tests required by the I-95 contract and there were no exceptions noted at the plant by GDOT employees.

26.     By February 1998, GDOT issued a Materials Certificate stating that the asphalt DAC had used for the I-95 project was in compliance with the I-95 contract's plans and specifications.

27.     In August 25, 2000, GDOT issued to DAC a Final Acceptance for the I-95 project, thereby certifying that DAC had substantially performed its duties pursuant to the I-95 contract.

28.     By 2003, GDOT alleged that surface problems began to appear in a section near the Darien Exit of I-95.

29.     On May 21, 2003, Defendant Geary sent an e-mail to Defendant Durrence stating that potholes had developed in a 3-mile section of I-95.  Defendant Geary, after only visual observations, prematurely concluded that the cause of the potholes was caused by insufficient lime in the asphalt produced by DAC.

*Testing Procedures*

30.     Despite the fact that GDOT was aware since at least 1986 that this particular

section of roadway suffered from foundation problems and was prone to settlement and cracking,

GDOT, without foundation, alleged that the problems were the result of a lack of hydrated lime

in the asphalt.  At this time, GDOT adapted various unreliable and inaccurate tests that would

support their already unsubstantiated formed conclusion.

31.     GDOT thereafter performed three types of "tests" on samples of the asphalt taken

from the I-95 project in an attempt to prove that insufficient lime was added to the asphalt mix at

the time of production by DAC.

32.     These tests are known as the fizz test, color test and tensile strength test.  No

testing agency or association, such as the American Society of Testing and Materials ("ASTM")

or the American Association of State Highway Transportation Organization ("AASHTO"), nor

any other state department of transportation has accepted these tests for determining the quantity

of lime placed in asphalt.  Additionally, to both the Plaintiffs' and Defendants' knowledge and

belief, these tests have never been used in the known universe for this purpose.

33.     Not only has GDOT provided sworn testimony that none of these tests are capable

of quantifying the amount of hydrated lime placed in the asphalt, the Defendants knew that none

of these tests were capable of quantifying the amount of lime placed in asphalt *before* the tests

were used.

34.     In June 2003, Defendant Qore, at the request of GDOT, took core samples from

the asphalt produced and placed by DAC for the I-95 project.

35.     GDOT devised plans for sampling the asphalt from the I-95 project and retained

Defendant Qore to assist in sampling and to perform the fizz test, color test and tensile strength test.

36.     Initially, GDOT's sampling plan required five (5) core samples to be taken from each lot of asphalt. A lot is a day's production, typically 1000 to 2000 tons. However, Defendant Douds influenced GDOT's decision that taking five (5) core samples would be too expensive and reduced the number of core samples to be taken from five (5) to three (3). Defendant Douds was also highly involved in how GDOT applied and utilized the results of the fizz test, color test and tensile strength test.

37.     Chris Arnold, an employee of Defendant Qore, was in charge of receiving core samples once the core samples were extracted from the I-95 project by GDOT or others.

38.     Ignoring all GDOT's published sampling requirements, Mr. Arnold utilized very crude and rudimentary methods to identify, store and transport the core samples. Examples of Mr. Arnold's methods include storing core samples in plastic bags that were eventually ripped, allowing portions of the core sample to be lost, and transporting core samples in the back of a truck with no proper storage or protection. Mr. Arnold was also influential with Defendant Douds in how GDOT applied and utilized the results of the fizz test, color test and tensile strength test.

39.     On or about July 30, 2003, based on tests Defendants knew were unreliable and inaccurate, GDOT ordered DAC to remove 7 lots of the asphalt it had produced and placed in connection with the I-95 project.

40.     On or about August 13, 2003, Qore sent the asphalt samples taken from the I-95 project to a testing company named Analytical Services Incorporated ("ASI") to perform atomic

absorption ("AA testing") testing.

41.     Upon information and belief, the testing method utilized by ASI was a variation of the AA testing developed by Defendant Lian. After conducting several AA tests for GDOT, ASI conveyed to GDOT that they would run no more tests.

42.     With the knowledge that one testing service (ASI) refused to conduct the tests for GDOT, two days later, Qore sent the same core samples to Defendant ATS to also perform AA testing in accordance with procedures developed by Lian.

43.     Despite testing the same asphalt samples, ASI and ATS reached significantly different conclusions as to the levels of hydrated lime in the same samples. These conclusions were ignored by GDOT and all Defendants and not disclosed to the Plaintiff until requested in discovery in pending litigation.

44.     Between August 2003 and February 2004, Qore continued to conduct extensive sample preparation and testing (fizz, color and tensile strength) for the I-95 project and ATS continued to conduct extensive AA testing of samples from the I-95 project. The results of these tests were known to be unreliable, inconsistent and inaccurate by all Defendants.

45.     In December 2003, an employee of ATS, Dr. Sue Zhang, became concerned about the procedure, accuracy and validity of the AA test used to determine the amount of hydrated lime in the asphalt samples. She contacted Defendant Lian, who responded by stating that "if it's high concentration calcium, that's not a problem for us because we're only looking for something lower calcium concentration, that's what we're concerned. So they said, go ahead, do it because we don't want to change the test in the middle of the project."

46.     Specifically, Dr. Zhang was concerned about the fact that lanthanum chloride was

not used during the tests. Dr. Zhang's concern was initially raised after she finally reviewed the instruction manual that came with the AA testing machine on or around December 2003.

47.    Lanthanum chloride is a chemical added during sample preparation to counteract the effects of other elements, such as silicates, that could interfere with the testing and give inaccurate results.

48.    After Dr. Zhang had run approximately 100 AA tests, she warned Lian that the AA tests were flawed. Dr. Zhang testified that "[h]is response was, like I said, first he was just saying because it's, in fact, high calcium concentration samples, therefore it's not harming what is on the other side, so therefore, it's not a big deal. Then later on the second thing, I think after I talked to him, he said – I said, I'm really concerned about this. So he said, okay, let me call you back. And he said, I need to talk to someone and then I'll call you back. So he called me back that day and say we still think because it's in the middle of the whole project, we don't want to change the procedure in the middle of the process."

49.    The failure to add lanthanum chloride to the testing samples caused the tests to show that the amount of hydrated lime in the samples was significantly lower than it actually was.

50.    Based on the use of these unreliable and inaccurate tests results, at the insistence of some or all Defendants, GDOT declared DAC in default of the I-95 project on January 26, 2004.

51.    At a Daubert hearing conducted in connection with pending litigation on the I-75 project, counsel for GDOT, in explaining GDOT's reasoning for not adding lanthanum chloride *after* they had been informed by ATS that the results were inaccurate, stated "The Department at

that time made a decision that they would not change their procedure.  They say, that's because you just don't care.  That was not necessarily the rationale.  The rationale was, let's go down this path and see where it takes us."

52.     During this same time frame, DAC's surety, Fireman's Fund Insurance Company, repeatedly sought the basis for the default.  However, Defendant Matthews would not cooperate in Fireman's Fund's investigation, eventually causing Ms. Freeman to file an Open Record Act Request.  Defendant Matthews, who was then head of GDOT's Claims Department, repeatedly informed Ms. Freeman that if Fireman's Fund did not take over the work, it "could be prohibited from issuing bonds."  Defendant Matthews also informed Ms. Freeman to "replace the road or else you'll never do any work in the State of Georgia again as a surety. "

### The I-95 Re-Paving Project

53.     On April 16, 2004, GDOT requested bids to repave the allegedly defective portions of the I-95 project on an "emergency basis."

54.     DAC was the lowest bidder for the work, but all bids were rejected at that time.

55.     The project was re-bid on July 16, 2004; however, this Proposal included several special provisions (Special Provisions 103.01, 103.06, and 103.07) designed by GDOT to expedite the process.

56.     Under standard specifications utilized by GDOT in executing contracts, five copies of the contract are mailed to the successful bidder, who normally has 15 days in which to execute the contracts and return them to GDOT.

57.     Special provision 103.06 provides in pertinent part that if the contract is awarded on July 23, 2004, GDOT will have the contract ready to pick up by the successful bidder by 1:00

p.m. on July 27, 2004.  The provision also stated that the contract shall be signed by the successful bidder and executed with proper bonds no later than 9:00 a.m. on July 30, 2004. However, nowhere was DAC instructed on where to pick up the contract.

58.     Special Provision 103.06, which can effectively act as a refusal if not complied with, was included in the contract on page 152.  In over thirty years of accepting contracts from GDOT, this was the first time DAC had ever dealt with a contract that included the special provisions listed above.

59.     On July 16, 2004, DAC was again the lowest bidder on the  I-95 re-paving project in the amount of $2,497,309.58, and was awarded the contract.  However, Defendant Mayo, GDOT's contract administrator, failed to notify DAC by mail or telephone that it had been awarded the contract.

60.     As a result, the award of the contract to DAC was cancelled pursuant to special provision 103.06.

61.     At 9:02 am on July 30, 2004, the 1-95 re-paving project was awarded to the second lowest bidder, Seaboard Construction Company, a/k/a Plant Improvement Company ("Plant Improvement"), in the amount of $2,891,695.99, costing the taxpayers of the State of Georgia over $400,000.

62.     At 9:55 am on July 30, 2004, a representative from GDOT contacted Plant Improvement to notify them that they had been awarded the 1-95 re-paving project.

63.     A second phone call was placed to Plant Improvement after 9:55, asking them when they could execute the re-paving contract.

64.     At no point after DAC was awarded the re-paving project was DAC ever

contacted to ask them when they could execute the contract.  Moreover, DAC was never

informed that the contract was ready for them to execute or that they had to execute the contract

in Atlanta before 9:00 am on July 30.

65.    On August 19, 2004, Defendant Mayo gave his deposition for pending litigation

between DAC and GDOT regarding an ongoing dispute about work done by DAC on I-95.  Mr.

Mayo testified as follows:

On the morning of July 30, 2004, at 9:00 a.m., he reviewed the contract, saw the special

provision 103 (which was contained within page 152) that required an expedited execution, noted

that DAC had not signed the contract on time, then had a memo drafted by his assistant, David

Hogue, stating that DAC had not signed the contract and that the project should be awarded to

the second lowest bidder.  Once he had initialed the memo, he then sought out the signatures of

Deputy Commissioner Larry Dent and Commissioner Linnenkhol.  That morning, neither the

Deputy Commissioner nor the Commissioner was able to sign the memo; Steve Henry signed for

the Deputy Commissioner and Defendant Mullins signed for the Commissioner.  Defendant

Mayo then proceeded downstairs, from the second floor to the first floor, in order to obtain the

above-mentioned signatures.  Once he got downstairs, he first had to go by Steve Henry's office

for his signature, and then had to interrupt Defendant Mullins from a meeting in order to obtain

his signature.  This whole transaction, from reviewing the contract, checking special provision

103, noting that DAC had not signed the contract, having a memo drafted and walking

downstairs to obtain two signatures, took a grand total of 9 minutes.

66.    Once DAC had subpoenaed David Hogue's deposition, six days later, at another

deposition, Defendant Mayo testified that instead of the memo being prepared at 9:00 a.m. on

July 30, 2004, the memo was actually prepared by David Hogue *before* 9:00 a.m. on July 30, 2004. In fact, Defendant Mayo testified he was out of the office July 27-29, and that when he did return to the office at 7:30 a.m. on July 30, 2004, the above-describe memo was waiting for him on his desk.

67.     Two days later, at a hearing in front of Judge Bedford in Fulton County, Georgia, Defendant Mayo admitted that he had given false testimony in his first deposition.

68.     These actions in regard to the I-95 re-paving project demonstrate more examples of DAC being singled out for disparate treatment without any rational basis.

### The I-75 Project

69.     On December 5, 2000, GDOT awarded contract No. NH-75-1(157)01 ("the I-75 project") to DAC that involved paving portions of Interstate 75, bridge rehabilitation and road widening in Turner and Crisp Counties. The I-75 project was federally funded and approved by the United States Secretary of Transportation.

70.     While working on the I-75 project, DAC encountered numerous unanticipated delays caused by issues beyond the scope of the I-75 contract. Under the I-75 contract, DAC is entitled to file a written request for an extension of time if work is delayed for reasons beyond the control of DAC.

71.     GDOT arbitrarily and without any justification denied DAC's requests for an extension of time and improperly assessed liquidated damages at $842,100. GDOT continues to assess liquidated damages in spite of the default. GDOT's conduct again evidences its consistent practice of unfairly administering contracts with DAC.

72.     Pursuant to the contract for the I-75 project, all tests were to be made by or at the

expense of GDOT and in accordance with AASHTO, ASTM, or the published specifications of any other designated organization that is current on the date of advertisement for the bids. Neither fizz, color, tensile nor AA is referred to in AASHTO or ASTM as an approved method for determining lime content in asphalt.

73.     GDOT's own quality control personnel had consistently examined and approved DAC's quality control results on a quality assurance basis daily, weekly and quarterly to assure the proper lime content in the asphalt concrete.  The only exception regarding lime noted by a GDOT employee was a single incident of placing *too much* lime in the asphalt mix.

74.     On July 2, 2004, the Defendants caused Scott Chambers, GDOT's Area Engineer, to issue a letter to DAC alleging that DAC had used faulty asphalt on the I-75 project, specifically alleging that the "hot mix asphalt concrete lots do not have the lime content required by the contract," and demanded that DAC immediately remedy the alleged deficiency.  The letter issued by Mr. Chambers failed to provide DAC with any test results supporting his summary conclusions.  However, these demands were based on the knowingly inaccurate tests conducted by GDOT, Qore and ATS.

75.     DAC repeatedly requested documentation of the nature of the tests performed and the results to justify Mr. Chambers' letter.  GDOT failed and refused to provide any such information in a timely manner.

76.     In August 2004, in an effort to seek relief from the unjust, unlawful and disparate treatment by Defendants, Plaintiffs met with the Board for the Department of Transportation. Specifically, Plaintiffs informed the Board that the tests utilized by GDOT to default them on the I-95 project was based on tests that were not a part of the contract and were based on tests that

have never been used for this purpose in the known universe.  Furthermore, Plaintiffs informed

the Board that GDOT had ordered DAC to remove and replace portions of the roadway that

GDOT could not afterwards locate.  Plaintiffs also informed the Board that GDOT had ordered

them to remove specific lots of asphalt based on core samples taken from *entirely different lots*.

Plaintiffs' appeal for fairness from GDOT's Board was ignored.

77.     Subsequent to Plaintiffs' meeting with the GDOT Board, Plaintiffs have kept

GDOT's Board and the Governor of Georgia, Sonny Perdue

78.     Months after GDOT had learned that these tests were inaccurate and unreliable,

on October 4, 2004, GDOT placed DAC in default on the 1-75 project for failure to remove and

replace the above-mentioned nine lots of asphalt per GDOT's direction.

79.     Since 2004, DAC and GDOT have been involved in litigation in the Superior

Court of Turner County and the Superior Court of Fulton County concerning hydrated lime

issues on projects performed by DAC for GDOT.

80.     After conducting a Daubert hearing, the Superior Court of Turner County

determined that the AA test devised by GDOT and used by Qore and ATS were fundamentally

flawed and excluded evidence of the tests from the case, referring to it as "junk science."  A copy

of the order of Judge McCorvey, dated January 13, 2006, is attached hereto as Exhibit "A".

81.     After conducting a Daubert hearing, the Fulton County Superior Court determined

that all tests devised by GDOT and utilized by Qore and ATS could not be used as evidence of

the lime content placed in the asphalt by DAC and excluded it from the case.  A copy of the order

of Judge Bedford, dated March 20, 2006, is attached hereto as Exhibit ("B").

82.     Just prior to the Judge McCorvey's court ordered mediation on August 10, 2006,

Defendant Linnenkohl removed DAC from the list of potential bidders for GDOT projects and defaulted DAC on other additional jobs in a continued effort to destroy DAC and the jobs of over 500 Georgians, thereby making good on his quote that: "If I was singling out Douglas Asphalt, I would have taken them off the bidder's list." From information given by Defendants and other GDOT personnel, this is the first time ever that GDOT has taken someone off the bidder list for the above-described reasons. This solitary, willful and malicious action was concocted by Defendant Linnenkohl and spearheaded by Defendant Mayo. A copy of that quote from the Fulton County Daily Report is attached hereto as Exhibit ("C").

83.     As a result of Defendants' actions, Plaintiffs Joel Spivey and Kyle Spivey have been forced to spend substantial amounts of their personal funds to keep DAC in operation and insure that its hundreds of employees are timely and fully paid.

84.     Specifically, Plaintiffs Joel and Kyle Spivey have had to liquidate various personal assets and have been unable to exploit other investment opportunities due to the financial distress of DAC caused by Defendants.

### III.     CAUSES OF ACTION

#### *Count I - Negligent Misrepresentation*

85.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 84 as if fully stated herein.

86.     Defendants Qore and ATS negligently developed and/or utilized the fizz, color, tensile, and AA tests to purportedly determine the amount of hydrated lime contained in the asphalt used for the I-95 project.

87.     Defendants Qore and ATS negligently represented that these tests were suitable

for testing the presence and/or quantity of lime placed in the asphalt.

88.     Defendants Qore and  ATS should have known that these tests were inaccurate and provided unreliable results.

89.     As a proximate result of Defendants Qore and ATS's combined negligence, Plaintiffs have suffered injury for which these Defendants are jointly and severally liable.

### Count II - Fraud

90.     Plaintiffs reallege and incorporate by reference Paragraphs 85 through 89 as if fully stated herein.

91.     Defendants Qore and ATS knew that the fizz, color, tensile and/or AA tests they developed and/or utilized to purportedly determine the presence and/or amount of lime in the asphalt supplied by DAC were scientifically and methodologically defective.

92.     Despite this knowledge, Defendants Qore and ATS misrepresented that these test were accurate and reliable in order to cause others to use and rely upon them.

93.     As a proximate result of Defendants Qore and ATS's fraudulent misrepresentations, DAC has been falsely been accused of having improperly constructed the I-95 project and has suffered damages therefrom.

94.     Furthermore, Defendants Qore and ATS knew that the tests were both scientifically and methodologically defective and incapable of accurately determining the amount of lime in the asphalt applied by DAC for the I-95 project.

95.     As a proximate result these Defendants' fraudulent misrepresentations that the tests were incapable of determining the amount of lime placed in the asphalt by DAC and that DAC had improperly formulated the SuperPave mix for the I-95 project, DAC has been harmed.

### Count III - Defamation/False Light

96.     Plaintiffs reallege and incorporate by reference Paragraphs 89 through 95 as if fully stated herein.

97.     Defendants Qore and ATS have falsely publicized and published to third parties that DAC improperly formulated the SuperPave mix used in the I-95 project.

98.     Such publications and publicity are false and misleading.

99.     Such publications and publicity constitute slander and/or libel per se.

100.     Such publications and publicity have also placed DAC and its officers, directors, and employees in a false light by attributing to them certain acts and omissions that are highly offensive.

101.     As a result of Defendants Qore and ATS's false and misleading statements, Plaintiffs have suffered harm.

### Count IV - Federal R.I.C.O. Act

### Parties

102.     At all times relevant to this Complaint, Defendants Qore, ATS, Geary, Durrence, Guohua, Lian, Mullis, Mayo, Matthews, Linnenkhol and Douds, a group of individuals and entities associated in fact, constituted an enterprise as defined by 18 U.S.C. 1961(4), which was engaged in and activities of which affected interstate commerce.  A purpose of the enterprise was to devastate and destroy Plaintiffs through mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

103.     Plaintiff DAC is, and at all relevant times has been, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964.

104.   Defendant Qore is, and at all relevant times has been, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964.

105.   Defendant ATS is, and at all relevant times has been, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964.

### The Pattern of Fraudulent Schemes

106.   On or about July 30, 2003, the Defendants caused GDOT to order DAC to remove 7 lots of asphalt it had produced and placed on the I-95 project.  GDOT based its order to remove the 7 lots of asphalt on the fizz, color and tensile tests, tests Defendants knew were unreliable and meaningless and had never been used in the known universe for determining the amount of lime placed in asphalt.

107.   On or about July 2, 2004, despite the fact that GDOT's own quality control personnel had consistently examined and approved DAC's quality control results on a quality assurance basis daily, weekly and quarterly to assure the proper lime content placed in the asphalt by DAC, Scott Chamber, GDOT's Area Engineer, at the direction of the individual Defendants, sent a letter to DAC alleging improper lime content and demanded DAC to remedy the alleged deficiencies on the I-75 project.

108.   Despite that fact that all Defendants knew that the fizz, color, tensile, and AA tests were fundamentally flawed and produced unreliable and meaningless results Defendants continued to use the fizz, color, tensile and AA tests to demand that DAC perform remedial work on other projects.  Furthermore, Defendant Linnenkohl subsequently took DAC off the bidder's list.  From information given by Defendants and other GDOT personnel, this is the first time ever that GDOT has taken someone off the bidder list.  This solitary, willful and malicious action

was concocted by Defendant Linnenkohl and spearheaded by Defendant Mayo.

109.    The Defendants pattern of racketeering activity as defined in 18 U.S.C. §§ 1961(1) and 1961(5), without limitation, consisted of the following schemes: a scheme to validate the test results so that those test results indicated low levels of lime in the asphalt produced by DAC, a scheme to default DAC on the above-mentioned projects based on those false and misleading test results, a scheme to conceal their fraudulent activities, and other violations of federal law.

### *Testing Scheme*

110.    In an effort to validate the tests that Defendants knew were false, inaccurate and misleading, Defendants hired Defendant Qore to begin taking asphalt core samples from 36 DAC projects, including each lot placed on the I-95 and I-75 projects.

111.    Defendants thereafter attempted to measure the amount of lime in the asphalt produced by DAC by utilizing three different tests (color, fizz and tensile tests).

112.    None of the three above-mentioned tests were allowed by the I-95 contract or I-75 contract, nor have they been used for this purpose in the known universe, and Defendants refused to provide any procedures or methods for the three tests until compelled by discovery in pending litigation.

113.    On August 13, 2003, Defendant Qore sent a selected group of samples to ASI to perform AA testing in a further effort to quantify the amount of lime in the asphalt produced by DAC.  After conducting several AA tests for Defendants, ASI conveyed to Defendants that they would run no more tests.

114.    On August 15, 2003, Defendants thereafter employed Defendant ATS to perform

tests to determine the lime content of the asphalt produced by DAC.  Despite testing the same asphalt samples, ASI and Defendant ATS reached significantly different conclusions as to the levels of hydrated lime in the lime samples.

115.    On August 15, 2003, Defendant Geary contacted Ken Kandhal at the National Center for Asphalt Technology.  On August 26, 2003, Defendant Lian sent Mr. Kandhal a copy of GDOT's AA test procedures for his review.

116.    On August 28, 2003, Mr. Kandhal sent GDOT a proposal to perform an objective investigation of the probable causes of the pavement distress on the I-95 project.  The proposal for an investigation, which totaled approximately $22,000, made no mention of AA testing and recommended very different methods of testing and sampling than those performed by GDOT. The proposal was specifically focused on the identification of causes for the distress on the I-95 project.

117.    Mr. Kandhal is thereafter asked by Defendant Geary to "scale down" his proposal. Mr. Kandhal thereafter sent a significantly reduced proposal that does not even include sampling and testing and totals approximately $5,000.  GDOT does not seek Mr. Kandhal's objective evaluation and later refuses to disclose these communications with DAC.

118.    In December 2003, Sue Zhang with ATS warned Defendant Lian about the flaws in the AA test administered by GDOT.  Defendant Lian told her to continue testing without changing the procedure.  GDOT now admits that the failure to add lanthanum chloride caused a significant undercounting of the amount of hydrated lime.

119.    At no point during Defendants' testing of asphalt samples did Defendants attempt to validate the testing procedures or testing results.  Furthermore, at no point during Defendants'

*Page -21-*

testing of asphalt samples did Defendants utilize the scientific method, whereby a hypothesis is

formulated from data, and then the hypothesis is *empirically tested*. Defendants did no such

empirical testing.

120.    Defendants later admit that the data from these three "chemical tests" cannot even

quantify the amount of hydrated lime placed in asphalt, but does so only after DAC is forced to

spend in excess of three million dollars on experts, attorneys fees and costs. Furthermore, the

Defendants have squandered in excess of three million of Georgia taxpayer's dollars in experts,

attorneys fees and costs to further the enterprise in the Defendants' attempt to financially destroy

Plaintiffs financially and in their business and personal reputations.

### Scheme to Default

121.    On or about July 30, 2003, Defendant Geary, with the knowledge and approval of

Defendants Linnenkohl and Durrence, sent a letter to DAC claiming that portions of the asphalt

used in the I-95 project were defective.

122.    This letter indicated that GDOT's opinion was based upon "chemical testing."

123.    At the time this letter was sent to DAC, the only testing performed by or at the

behest of GDOT was fizz, color, and/or tensile tests.

124.    At the time this letter was sent to DAC, all Defendants knew that the fizz, color,

and/or tensile tests were unreliable and produced inaccurate results.

125.    On or about January 26, 2004, GDOT sent a letter informing DAC that it was in

default of the I-95 project for failing to remove and replace portions of the roadway re-surfaced

during the I-95 project.

126.    At the time this letter was sent to DAC, all Defendants knew that the fizz, color,

tensile, and AA tests were fundamentally flawed and produced unreliable and meaningless results.

127.    On or about October 4, 2004, Defendants caused GDOT to send a letter informing DAC that it was in default of the I-75 project for failing to remove and replace portions of the roadway surface.

128.    At the time this letter was sent to DAC, all Defendants knew that the fizz, color, tensile, and AA tests were fundamentally flawed and produced unreliable and meaningless results, and that GDOT's own quality control personnel had consistently examined and approved DAC's quality control results on a quality assurance basis daily, weekly and quarterly to assure the proper lime content placed in the asphalt by DAC.

129.    Despite these facts, Defendants continued to use the fizz, color, tensile and AA tests to demand that DAC perform remedial work on other projects.

### *Cover-Up Scheme*

130.    In an effort to cover-up the aforementioned schemes to devastate and destroy DAC, in December of 2003, Dr. Sue Zhang informed Defendant Lian that she was concerned that the AA test results were not accurate due to the failure to add lanthanum chloride to the testing procedure.  Dr. Zhang was informed by Defendant Lian that "if it's high concentration calcium, that's not a problem for us because we're only looking for something lower calcium concentration, that's what we're concerned.  So they said, go ahead, do it because we don't want to change the test in the middle of the project."

131.    After Dr. Zhang had run approximately 100 AA tests, she warned Defendant Lian that the AA tests were flawed.  Dr. Zhang testified that "His response was, like I said, first he

was just saying because it's, in fact, high calcium concentration samples, therefore it's not

harming what is on the other side, so therefore, it's not a big deal.  Then later on the second

thing, I think after I talked to him, he said – I said, I'm really concerned about this.  So he said,

okay, let me call you back.  And he said, I need to talk to someone and then I'll call you back.  So

he called me back that day and say we still think because it's in the middle of the whole project,

we don't want to change the procedure in the middle of the process."

     132.    In a further effort to cover up the aforementioned schemes to devastate and

destroy Plaintiffs, Defendant Matthews' attempted to "bully" Fireman's Fund Insurance

Company, DAC's surety, to replace the roadway on I-95, informing Katherine Freeman, a

consultant for Fireman's Fund, that if Fireman's Fund did not take over the work on I-95, it

"could be prohibited from issuing bonds."  Defendant Matthews also informed Ms. Freeman to

"replace the road or else you'll never do any work in the State of Georgia again as a surety. "

These actions by Defendant Matthews were an attempt to keep Plaintiffs away from the I-95

roadway and to prevent Plaintiffs from conducting independent testing to confirm that the asphalt

contained the appropriate amount of lime.

     133.    In a further effort to cover up the aforementioned schemes to devastate and

destroy DAC, Defendant Greg Mayo initially testified that after 9:00 a.m. on July 30, 2004, he

reviewed the contract with DAC to see if they had signed it, saw that they hadn't, reviewed

contract specification 103, and had his assistant David Hogue draft a memo to Defendant Harold

Linnenkohl that DAC had failed to execute the contract and file acceptable bonds as required.

The memo was date-stamped 9:02 a.m.

     134.    Several days later, in preparation for his second deposition, Defendant Mayo

recanted his former sworn testimony that he had reviewed the contract with DAC, saw that they had not signed it and had a memo drafted to that effect for his signature within 2 minutes. Defendant Mayo finally admitted that he was actually out of town from July 27-29, 2004. Furthermore, Defendant Mayo further testified that the memo that he formally testified he had drafted *after* 9:00 a.m. on July 30, 2004 was actually prepared and ready for his signature when he got to the office at 7:30 a.m. on July 30, 2004.

135.   In a further effort to cover-up the aforementioned schemes to devastate and destroy Plaintiffs, the failure to award the I-95 repaving project to DAC, despite that fact that they were the low bidder by more than $400,000, was an effort to keep Plaintiffs away from the I-95 roadway. These actions by Defendant Mayo were a further effort to keep Plaintiffs away from the I-95 roadway was to prevent Plaintiffs from conducting independent testing to confirm that the asphalt contained the appropriate amount of lime.

136.   In a further effort to cover-up the aforementioned schemes to devastate and destroy DAC, some or all Defendants, counsel for GDOT and possibly others met in August 2004 and made a conscious decision to continue to use knowingly inaccurate and false tests to require millions of dollars in remedial work on I-95, I-75 and numerous other projects by DAC and to default them on these projects. These actions were taken with the clear intent to further the scheme of using fraudulent and other illegal means to destroy Plaintiffs.

137.   Defendant Larry Matthews, former Construction Claims Administrator for GDOT, was involved in the approval of bills of GDOT's counsel for the DAC litigation, the law firm of Lawson, Davis, Pickren & Seydel. Included within the law firm's billings was an approval for 32+ hours billed by *one* GDOT lawyer for *one day*. Defendant Matthews was

thereafter retained by the same law firm of Lawson, Davis, Pickren and Seydel to perform independent analysis of lime audits.  Between June 2005 and April 2006, Mr. Matthews has billed Lawson, Davis, Pickren & Seydel over $100,000 for his services that were ultimately paid for by the State of Georgia.

### *RICO Count 1*

138.    Plaintiffs reallege and incorporate by reference Paragraphs 96 through 137 as if fully stated herein.

139.    For the purpose of executing and attempting to execute the aforesaid schemes to devastate and destroy Plaintiffs, the Defendants repeatedly caused letters and other matters and things to be delivered by the United States Postal Service to and from this district and elsewhere, in repeated violation of 18 U.S.C. § 1341 (mail fraud).  These mailings include but are not limited to:

      (a)    the August 28, 2000 letter sent by David Graham from Atlanta, Georgia and received by Plaintiffs in Douglas, Georgia, notifying DAC that the final construction inspection on the I-95 project had been made in accordance with the Standard Specifications covering this project and authorizing the District Engineer to submit a final statement for payment of work done.

      (b)    The January 30, 2003 letter sent by Defendant Geary from Forest Park, Georgia and received by Plaintiffs in Douglas, Georgia, informing Plaintiffs that their asphalt plant located in Atkinson, Georgia was immediately suspended from Georgia's List of Approve Hot Mix

Producers until they could prove that the hydrated lime system operated as required.

(c)    the July 30, 2003 letter sent by Defendant Geary from Forest Park, Georgia and received by Plaintiffs in Douglas, Georgia, ordering DAC to remove and replace lots on 1-95 and demanding $28,352.00 for repair work done on I-95 by GDOT.

(d)    the September 12, 2003 letter sent registered mail by Glen Durrence from Atlanta, Georgia and received by Plaintiffs in Douglas, Georgia, informing Plaintiffs that if DAC or its surety does not proceed in a satisfactory way to remedy the faults outlined in the July 30, 2003 letter, GDOT would declare DAC in default of the 1-95 contract and direct the surety to take over work.

(e)    the January 22, 2004 letter sent registered mail by Glen Durrence from Atlanta, Georgia and received by Plaintiffs in Douglas, Georgia, declaring DAC in default of the 1-95 project for failure to remove and replace lots on I-95.

(f)    the July 2, 2004 letter sent via facsimile and US mail by Scott Chambers from Tifton, Georgia and received by Plaintiffs in Douglas, Georgia, ordering DAC to remove and replace lots on 1-75.

(g)    the October 4, 2004 letter sent via facsimile, first-class mail and certified mail, return receipt requested, from Paul Mullins sent from Atlanta, Georgia and received by Plaintiffs in Douglas, Georgia, declaring DAC in

default of the I-75 project for failure to remove and replace lots on I-75..

(h)  The October 20, 2004 letter from Paul Mullins sent from Atlanta, Georgia via UPS next day air and received by Plaintiffs in Douglas, Georgia, informing Plaintiffs that the test utilized by GDOT to measure the amount of lime placed in the asphalt by DAC were in effect at the time of the bidding and the contract for the I-75 project were not contrary to GDOT specifications.

(i)  The August 11, 2006 letter from David Graham sent from Atlanta, Georgia via certified mail and received by Plaintiffs in Douglas, Georgia, informing Plaintiffs that DAC's Certificate for Qualification had been suspended for 6 months and that at the end of the 6 month period, DAC would be required to file a new application for qualification.

140.  Upon information and belief, for the purpose of executing and attempting to execute the aforesaid schemes to devastate and destroy Plaintiffs, Defendants repeatedly caused to be made and made interstate telephone calls and other uses of interstate wire facilities to and from this district and elsewhere, in repeated violation of 18 U.S.C. § 1343 (wire fraud).

141.  Each of the aforesaid violations by Defendants of the mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, constitutes an instance of "racketeering activity" as defined in 18 U.S.C. § 1961(1).

142.  The multiple acts of racketeering activity by the Defendants were interrelated, part of a common and continuous pattern of fraudulent schemes, and perpetrated for the same or similar purposes, thus constituting a "pattern of racketeering activity" as defined in 18 U.S.C. §

1961(5).

### *RICO Count 2*

143.     Plaintiffs reallege and incorporate by reference Paragraphs 138 through 142 as if fully stated herein.

144.     By reason of the aforementioned circumstances and events, Defendants unlawfully, willfully and knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of GDOT through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

### *RICO Count 3*

145.     Plaintiffs reallege and incorporate by reference Paragraphs 143 through 144 as if fully stated herein.

146.     By reason of the aforementioned circumstances and events, the Defendants conspired to unlawfully, willfully and knowingly conspired to conduct and participate, directly or indirectly, in the conduct of the affairs of GDOT through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

### *RICO Count 4*

147.     Plaintiffs reallege and incorporate by reference Paragraphs 145 through 146 as if fully stated herein.

148.     By reason of the aforementioned circumstances and events, the Defendants unlawfully, willfully and knowingly made false statements, false reports, false representations and false claims with respect to the character, quality, quantity and cost of any work performed or to be performed by DAC, or materials furnished or to be furnished by DAC, in connection with

the construction of any highway or related project approved by the United States Secretary of Transportation, in repeated violation of 18 U.S.C. § 1020.

## Count VI - 42 U.S.C. § 1983

149.    Plaintiffs reallege and incorporate by reference Paragraphs 147 through 148 as if fully stated herein.

150.    Defendants Linnenkohl, Mayo, Geary, Durrence, Lian, Mullins, Matthews and Douds continuously, without any rational basis, have selected DAC for disparate treatment, including withholding monies owed, monies for liquidated damages, using fraudulent and illegal tests to attempt to require remedial work, placing DAC in default on numerous projects and removing DAC from the bidders list, all in violation of the due process rights guaranteed to the Plaintiffs by the United States Constitution.  Furthermore, Defendants Linnenkohl, Mayo, Geary, Durrence, Lian, Mullins, Matthews and Douds' above-described actions have denied Plaintiffs equal protection under the law, as guaranteed by the 5th and 14th Amendments of the United States Constitution.

151.    Defendants Linnenkohl, Mayo, Geary, Durrence, Lian, Mullins, Matthews and Douds are responsible for supervising the process by which GDOT requests, evaluates and awards road projects in this state.

152.    These Defendants, while acting under color of State law, knowingly, intentionally, and without justification prevented DAC from accepting the award as the lowest bidder for the project to resurface portions of I-95.

153.    These Defendants, while acting under color of State law, knowingly, intentionally, and without any justification removed DAC from the list of potential bidders for GDOT projects.

154.    Such action has deprived Plaintiffs of their rights and freedoms without due process of law.

155.    The actions of the Defendants, by knowingly showing disparate treatment toward DAC without a rational basis, are in violation of the Equal Protection Clause of the United States Constitution.

156.    These Defendants knew or reasonably should have known that the aforementioned actions within the sphere of their official responsibility would violate the constitutional rights of Plaintiffs.

157.    These Defendants took the aforementioned action with the malicious intention to cause a deprivation of Plaintiff's constitutional rights.

### Count VII - Punitive Damages

158.    Plaintiffs reallege and incorporate by reference Paragraphs 149 through 157 as if fully stated herein.

159.    Defendants' fraudulent, reckless, and/or intentional conduct towards DAC shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences, thereby entitling DAC to punitive damages under O.C.G.A. §51-12-5.1.

### Count VIII - Attorney's Fees and Expenses

160.    Plaintiffs reallege and incorporate by reference Paragraphs 158 through 159 as if fully stated herein.

161.    Defendants have engaged in bad faith conduct in their dealings with DAC and/or have been stubbornly litigious, entitling DAC to attorney's fees and expenses pursuant to 18

U.S.C. § 1964 and O.C.G.A. § 13-6-11.

WHEREFORE, Plaintiffs DAC, Joel H. Spivey and Kyle Spivey pray:

A)      That summons be issued and served upon all Defendants in this matter along with this Complaint;

D)      That Plaintiffs recover compensatory damages jointly and severally from Defendants;

E)      That Plaintiffs recover all penalties provided under the federal R.I.C.O. statute, 18 U.S.C. § 1961, et seq., including but not limited to an award of threefold the damages suffered, plus interest, in an amount not yet ascertained.

F)      That Plaintiffs recover punitive damages in an amount sufficient to punish, penalize and or deter Defendants;

G)      That Plaintiffs recover all reasonable attorneys' fees and expenses it has incurred in bringing and pursuing this action;

H)      That Plaintiffs be awarded all other remedies deemed just and appropriate by the Court.

This _____ day of October, 2006.

FUTCH & BOWEN, LLC

Kenneth E. Futch, Jr.
Georgia Bar No. 281158

*Page -32-*

P.O. Box 943
Blackshear, GA 31516-0943
(912) 449-3911

SAVAGE, TURNER, PINSON & KARSMAN

Brent J. Savage
Georgia Bar No. 627450
C. Dorian Britt
Georgia Bar No. 083259

304 East Bay Street
Savannah, Georgia 31401
(912) 231-1140